Your Honor, may it please the Court, Linus Banghart Lynn, Assistant Attorney General for the State of Michigan, on behalf of the Respondent Warden, respectfully requesting that this Court reverse the District Court's grant of habeas relief and affirm the denial on the cross-appeal issues. The cross-appeal issues, I'm going to rest on the brief unless the Court has any questions or unless there's something I need to address in rebuttal. I'm going to focus on the, I think the core argument of this case is that the erroneous admission of the September 8th statements did not substantially and injuriously influence the jury's verdict in this case. And the chief reason for that is that the properly admitted evidence was not only sufficient, which isn't the standard of course, but was actually overwhelming evidence of Mr. Hendrix's guilt as to this carjacking. And Judge Goldberg Before you move on to harmless error, can you tell us why it took you so long to concede error in this case? Linus Banghart I think that, I'm not entirely sure, but I think that in our first pleading in the District Court, I think that it was an oversight because if you read our answer, we don't actually address the September 8th statements. And so we don't say, well, yes, he did invoke and then they re-initiated and then he spoke again and they admitted it, but it wasn't error. We didn't make that argument. We simply said Judge Goldberg You made it all the way through the state court, all the way through the Michigan courts that went up and down, and you know what Edwards says, don't you? Linus Banghart Yes, I know what Edwards says. Judge Goldberg I mean, why did the state not concede an Edwards error in the state proceeding? Linus Banghart I don't know. I don't know why. I'm not sure. Judge Goldberg Is it a violation of ethics rules, I guess, for the Attorney General not to raise something that's obvious that they know about? Linus Banghart Well, the Attorney General didn't handle the case in the state courts, so that's a separate question as far as Judge Goldberg Okay. Macomb County did, right? Linus Banghart Macomb County. Judge Goldberg Okay. All right. All right. That's, you know, sometimes the Attorney Generals do Linus Banghart Sometimes. Judge Goldberg do the appeals in smaller counties in Michigan. Linus Banghart Right. Right. Judge Goldberg But you're right. Linus Banghart So, the Macomb County prosecutor didn't raise it. All right. Okay. I think I understand. And then you guys got in the case, and you recognized the Edwards error. Linus Banghart Well, we eventually did recognize the, in our second pleading we filed, we recognized the Edwards error. And I think the first pleading we filed, it was simply an oversight. In terms of not, I think maybe we didn't understand. In the same way that the Michigan Court of Appeals, I mean, the way they framed it was, you know, he was Mirandized, he spoke, he waved Miranda, so it was fine. They didn't sort of recognize Edwards and then erroneously say, but this isn't an error. They just kind of... Judge Goldberg Like they didn't know Edwards even existed, I think. Linus Banghart Or even understand that that was the claim. And I'm not trying to... Judge Goldberg But wasn't the Edwards claim brought to the attention of the Michigan Court of Appeals in that motion to remand where they wanted evidentiary hearing as to the waiver form that said that he demanded counsel and also the police report that indicated that he had demanded counsel when he stopped the interrogation on September 6th? Linus Banghart Right. It was brought to the court's attention. So I don't know why they didn't, why the court's opinion read the way it did. Judge Goldberg Okay. At this juncture then, I mean, you concede error. Do you concede error because Edwards is clearly established law as set forth by the Supreme Court? Linus Banghart Yes. Judge Goldberg And since that is clear, is there any EPTA deference in this case, since there is a clear violation? Linus Banghart I don't think that we can argue any EPTA deference because we're conceding the error itself. Judge Goldberg Okay. So we review it de novo? Linus Banghart De novo. But it's the Brecht harmlessness standard. So it's a different standard and it is a more friendly standard to us, which is we don't bear the burden of proving that it was harmless beyond a reasonable doubt. Judge Goldberg Sure. Linus Banghart Instead, the standard is whether there was  Judge Goldberg Substantial and injurious. So if it was a... Judge Chalmers You're not entitled to double deference as you would be under EPTA. You concede that. Linus Banghart No. Yes. No, that's right. And even if the state court had done a harmlessness analysis, they would have done it under Chapman. So we'd be only entitled to add pedeference to the Chapman analysis, not to the Brecht analysis. So it all washes out and ultimately the question is for this court to say, did it make a difference to the verdict? And so this court has to imagine that there's a juror who hears, he's caught in this car in this crack neighborhood in Detroit six hours after it's stolen. He lies to the police about where he got the car. He says, I don't know where I got the car. That's false. He knows where he got the car. Wherever he got it, he knows. He, the car was stolen from an area around where he steals cars, around where he lives and he steals cars. It was stolen in the method he uses to steal cars. But he had never done a carjacking before. The other cars, there was nobody in it, right? They were unoccupied cars and it was like a crime of opportunity. This was a, this was different that you have a person in the car. It was different in that case. It's, I think a juror could, could decide that he might not have been aware depending on the angle that he approached the car. The car stopped. Somebody got out and went into the store. So from where he's standing, he might not be aware that there's somebody still in the car. He sees the opportunity. He might've been surprised to see. Okay. But if you're saying this is his pattern and conduct, I mean, the fact that there is an occupant in the car is different from the pattern. That is true. And the jury is. He had on the other ones. Right. And, and how do you, how do you deal with the misidentification? Did the, first of all, the petitioner, how, how tall is he? I don't know, actually. Does he wear glasses? He doesn't wear glasses to my knowledge. What color hair is he? He has brown hair. Okay. Now, didn't the victim say he was a tall white male who was wearing glasses? Well, he was a white male and, and a blonde hair, I think it was. I think the evidence was blonde or brown. So might've been blonde. Okay. So, I mean, they argue there's, there's misidentification and that's pretty strong that he's not the perpetrator. Well, and the jury was allowed to consider that. And I think a juror could harbor reasonable doubt based on that misident, based on that inapposite identification. And any juror who did harbor reasonable doubt based on the properly admitted evidence would continue to harbor reasonable doubt after the September 8th statements, because again, they'd be hung up on the identification. So the juror, the jurors are allowed to consider that. And the jurors could be aware of, you know, I mean, in every case before this one, defendants tell me eyewitness identification isn't reliable. This all happened very fast. This person is giving statements, you know, in, in extreme stress. They're literally dying on the pavement. We cannot believe what she's saying. Of course, in this case, her identification, you know, we're told by the defense is very reliable and proves his innocence. So it's a little bit of role reversal, but the point is that this was all in front of the jury. And so the jury was allowed to make this determination. This jury was, jury was, the argument by the prosecutor, McComb County prosecutor was because he refused to talk on September 8th, he must be guilty that his silence is deafening and an innocent person would talk. I mean, I can't think of a clear fifth amendment violation of one's right against self-incrimination that occurred here. And isn't that powerful stuff? I need to, I need to respectfully correct you on two points as to that. First of all, the prosecutor's argument was both as to the September 6th and September 8th statements. Second of all, it wasn't as to his silence. He chose to speak, but he gave false statements. Well, you can't talk to him with, under Edwards unless he initiated it. The whole, the whole, everything he said September 8th is inadmissible and it's error, clear error, clear violation of Edwards to say anything that he said. Right. The September 8th statements, it is, it's not a Doyle violation, but it is an Edwards violation. It is a fifth amendment violation. No question. Wait, wait, wait, wait. I think it's an absolute Doyle violation. I understand. Because, you know, I'm looking at Anderson v. Charles, you know, which talked about the Doyle. And it says, look, it's not that you can't, if he says anything, it doesn't mean that you can now talk about his silence or the, infer guilt from silence. You can, in Edwards, it was a, he was a, the guy was arrested in possession of the murder victim's car. And he testified, he tells the investigating arresting officer the car was stolen from a specific area. Then he takes the stand at trial and says, oh, it was, it was stolen two miles away. And what the prosecutor there did is pointed out the contradiction, you know, impeached him, which is perfectly okay, but that doesn't mean that you can draw meaning from the silence. No. And that's what happened here, isn't it? There's a huge, I mean, as Judge Griffin just said, there's testimony, in closing argument, his silence is deafening. It was like a thunderbolt from the sky. In other words, he's saying he did it and that was all drawn from his silence. Was it not? I don't, I don't agree. I don't agree with the prosecutor or you that it was his silence. I think that that is a rhetorical statement. I think that he, it was his speech. If on September 8th he said, you know, I'm willing to talk, but then he didn't say anything. Or he said, I'm not willing to talk. Then any use of, well, he had the chance to say something and he didn't. He had the chance to say something and he did. He did say that he didn't know where he got the cars. He did say that he was at a 7-Eleven in Sterling Heights. He did say these things. And it was the statements, not the silence, even though the prosecutor used the word silence, but it was the statements that he made that were used against him. It doesn't matter for the September 8th statements. It's a Fifth Amendment violation. So we're really counting angels on the head of a pin. Well, I don't know. I'm reading from the transcript here. This is the examination by the prosecutor of Detective Hogan. And he's saying things like, so what did it tell you as a detective that he didn't give you any information about his whereabouts at the time of the carjacking? He did not want me to know where he was. Now, sir, did he explain to you how he gained possession of the caravan? No. Did he tell you he bought it from a crack addict? No. Did he say he abandoned it on the street? No. Did he say he found it abandoned on a highway? No. Did he say it was a gift? No. Is there any explanation other than being the thief? No. If he's not the thief, what would you expect him to tell you? Would you expect him to tell you? Yes. I mean, all that is drawing inferences from silence. From what he didn't say in light of what he did say. So I think it's a significant distinction to say if you do speak, we can infer things from what you also don't say when you choose to speak versus if you don't speak, can we draw inferences from it? Do you have a case you can cite us of these kind of facts? I thought that Anderson v. Charles stood for that, and I may be mistaken because that's fair.  That's fair. I see that my time is up. I'd be glad to answer any other questions otherwise. Okay. I know your time's up, but this is a pretty important case. Thank you. Can you go through why you think this is harmless underbrek? I mean, that's how you started out, and then we kind of interrupted you, but I really want to hear your argument. I think it's harmless underbrek because almost any juror would harbor no reasonable doubt as to his guilt given the fact that he's caught in the car, the 404B evidence of the previous car thefts with the same MO and the statements on September 6th lying and saying, I don't know where I got the car. Any juror who is willing to harbor reasonable doubt at that point is not going to be significantly moved by what is mostly cumulative, the September 8th statements, simply because the stakes are higher. I mean, basically you've got to imagine a juror who says, I think an innocent person could lie to the police, but not twice. I don't think that that's correct. I think that any but juror who's willing to harbor reasonable doubt and say, no, he didn't carjack this car, he stole it in Sterling Heights, or he stole it from the person who carjacked it, or he bought it from the person who carjacked it, and he lied to the police, I think they're willing to say, yeah, and he lied to the police again on September 8th. That doesn't mean he's guilty. He still could have done these things. The September 8th statement just didn't give enough to move the needle on somebody who's already harboring reasonable doubt, but most jurors wouldn't be harboring reasonable doubt at all. The prosecutor really emphasized it, though. Didn't he say the difference between September 6th and 8th is the victim is now close to death. Right. And, I mean, he emphasizes to the jury that, yeah, sure, maybe in September 6th that he wouldn't say it, or what he's doing, but any reasonable person when faced with a possibility of a murder charge, and this is September 8th, would come forth at that point because of the victim's deteriorating health and say where he is. So, I mean, that's kind of a powerful argument that his silence on September 8th was important, and I think that's why the prosecutor emphasized it, isn't it? I mean, you don't think that that moved the needle at all? I don't think it moved the needle. I think if it moved the needle, it was a needle that was already in the rat. I mean, once it's already there. Okay. So he's just kind of piling on at that point? I think so. And I'll point out the defense counsel also emphasized how the September 8th statements weren't that meaningful because the police are allowed to lie, and the defendant, rather, didn't necessarily know that she was on death's door or that she was harmed at all because the police are not required to tell the truth in that situation. They can say, you're facing a murder charge in order to ramp up the pressure, and the defense counsel pointed that out to the jury, and the defendant might have. But Judge Cohn, too, didn't help the prosecutions ... I mean, he was on the prosecution's side with respect to the September 8th in his decision. Am I correct about that? Judge Cohn? Yeah. No, no. Judge Cohn found that there was ... Doyle error? I think he found there was not Doyle error, but he found that there was Miranda and Edwards error. For sure. That, for sure. Yes. Well, let me ask you ... In fact, I'm looking at page 19 of Judge Cohn's opinion, and he says these statements ... He's talking about the September 8th statements. These statements were a key piece of evidence for the prosecution, and without it, the case against Petitioner would have been significantly weaker. The importance of the September 8th statements played for the prosecution's case is manifest from a fair reading of the trial record. So his evaluation of the importance is far different than your evaluation. Yes. I agree with you, and I disagree with ... I think Judge Cohn simply erred. I think if you look at page 16 and 17 of his opinion, Judge Cohn says, without the September 8th statements, the evidence against Petitioner is, one, that he was found in the vehicle hours after the robbery, and two, that he had on previous occasions stolen cars from the same area and driven them to the same location in Detroit. There's no mention of three, which is his lying to the police on September 6th saying he didn't know where he got the car. That's a key piece of evidence that Judge Cohn almost ignores in his opinion, and I think that's a key ... I mean, with respect to Judge Cohn, I'm not attacking him personally, but I'm attacking his opinion because it really leaves out the September 6th statements and how powerful those are, and I think they move the needle into that right now. I'm getting into your opinion and ... Right. No, I understand. Judge Cohn ... I respect Judge Cohn's opinion. I just respectfully think it's a ... Your opinion is with respect to what a reasonable juror would think. Yes, and I think a reasonable juror ... Not so much ... Right. Right. Exactly. Judge Cohn also found ineffective assistance of counsel. Yes. Strickland's got the two prongs, deficient performance and prejudice. You can see deficient performance, don't you, Attorney? No, we've argued that there might be reasons why ... Okay, how would there be ... How could that be reasonable performance to fail to raise the obvious Edwards issue? Because a reasonable attorney ... Again, this is an objective standard, so we don't need to worry about what this attorney did, but a reasonable attorney could say, however implausible, I want the jury to hear an explanation of where he was, and I don't want to call him to the stand and have him testify to it and be subject to cross-examination. If I can get that in through his statement on September 8th saying I was at a 7-Eleven in Sterling Heights, then as bad as it is, I don't have a great case, as bad as it is, I want that in because it's better than nothing. A reasonable attorney could make that call. I'm not saying it's the right call, but Strickland tells us that there's more than one right way to try a case. Strickland tells us we don't look for best practices and we indulge every presumption of competent performance. Ultimately, I don't think it matters because you have a prejudice prong just like we have a harmlessness analysis, and either way, if this court decides to influence the jury's verdict, I mean, we lose on the Edwards issue whether we win or lose on the Strickland issue, so it doesn't end up mattering. Thank you, Your Honors. Thank you, Counsel. Good morning, Your Honors. Michael Skinner on behalf of Mr. Hendricks. I don't want to spend a lot of time on this, but I just want to briefly mention the Macomb County Prosecutor's Office. This case has been frustrating me for 10 years. All I do is criminal appeals, and this unique among them, I felt the Macomb County Prosecutor was being disingenuous and possibly just flat-out misleading the court throughout the proceedings, raising Sixth Amendment arguments when it's a Fifth Amendment claim. In any event, I know the AG is handling it now, but it's been very frustrating to me. In any event, in looking at this case, okay, so we have a standard that says substantial and injurious effect, and then we have to look at, well, what would the jury have thought? Take out the evidence. It's not a sufficiency standard. Okay, maybe the evidence is still sufficient to convict him, but did it have a substantial and injurious effect? I would recommend that you just look at the first few pages of the closing argument again. I'm sure you have since it's a big part of this. You know, the prosecutor could tell. No, you could tell that he could tell that he had a tiger by the tail here that, okay, we've got the guy in the car, he's known for stealing cars, but we don't have a witness. We don't really know exactly what happened. We have all these little holes in the case that could be problematic. He knew it. He said, I don't have to prove beyond no doubt, and he really hammered this home. You know, just use your reasoning and common sense, and heck, if somebody's found in the car six hours later, you know, we're done. And then he went on and he said there are three pieces of evidence. What are those three pieces of evidence? Okay, he's found in the car, he's known to steal these cars, and the statements. As to the statements, number one, I want to emphasize the September 6th statement and the September 8th statement are very different. And even on the part where they overlap, the September 6th statement, he makes one comment to the officers who are taking him to the Macomb County Jail, I don't know how I got the car. What does he say in the September 8th statement on that overlapping issue? He doesn't say, I don't know. He says, I don't want to say. He says, I don't want to get into more trouble. Why? Because at that point, he's been told, Detective Hogan said this. Okay, I knew this, I learned her situation, and I told him. And it's after that point that he says, I don't want to tell you how I got that car. That's different. You can imagine a lot of serial car thieves saying, I don't know how I got the car. As an off the cuff to the guy driving him to the station. But when you know what's going on, and that's what Judge Cohen pointed that out in his opinion. That understanding of what he was facing. He had pled guilty to other car thefts. In this trial, they had evidence. Here, he pled guilty to one of these 404Bs. He knew he was in the system, as the prosecutor said. He knew what he was facing for stealing a car. He didn't want to be on the hook for something more.  And if you take that out. If you imagine the jurors sitting there saying, well, okay. We've got him in the car hours later. We have officers that testify that these crack addicts trade cars back and forth. They change hands a lot. The description, as I believe your Honor pointed out. The description doesn't match. I'm not here arguing that they should be out there. That is a 100% reliable description. I honestly don't care how reliable it was. But the point is, she sure didn't describe him. It's fairly important, isn't it? Well, it is. I think the fact that the one statement. They have no video surveillance at this party store. They have nobody who knows exactly what happened. They have no identification. The only identification of the perpetrator is of somebody who does not look like my client other than race. He's a white guy. The identification actually starts with he has the car. And he has his prints on the car, right? Oh, sure. Absolutely. So you say the only. You have to start there. Well, let me say this. The only identification of who took the car. Who took the car. Obviously he's in possession of, I don't dispute, he's in possession of a stolen car. So, yes, he is tied to this stolen car. But as to who actually took the car initially and then would be on the hook for the felony murder, that we don't have an identification for at this dying declaration. What is the thing about there were fingerprints found that were not identified? They found fingerprints of the victim. They found fingerprints of the petitioner. And then there was also another set of fingerprints, but they were not identified. Was that? That was not, to my memory of the trial, that was not argued largely, and I don't know why. Quite frankly. I think if I were defense counsel, I would say the victim identified somebody else, plus somebody else's fingerprints were found in the vehicle. Hence, somebody else might have hijacked the car. Right. I mean, it would seem to me to be standard. I'm looking at this Breck standard. I'm weighing all the evidence. I mean, it's different than sufficiency. I mean, I agree that the evidence, with a certain circumstantial weight, it's a different standard, whether a reasonable juror could convict. But under Breck, is it going to have an injurious and substantial effect on the verdict? And considering everything, I don't know. It's a weak case. I don't know how it doesn't have it. If I'm sitting on a jury, and I hear, this was not an isolated statement. The officer testified at length. An innocent person would have told me. That's my experience as an officer. What are jurors looking at? What are jurors looking at? The point would be whether that's something that really influences a jury, that they hear he didn't give an excuse. Right. Over and over, they heard he didn't give an excuse. But they also said, he's the guy in the car. His girlfriend's purse is in the car. He lied to the police. Isn't that what we're deciding? Whether that he didn't give an excuse, he was silent, has a substantial and injurious effect on the jurors, such that it affects the jury's verdict. Right. Okay, that's the issue, as I get it. Yeah.  Yeah, and what happens is, the officer and the prosecutor, in closing argument, they equate that with a confession. They say he confessed, essentially. I mean, I'll just re-read that block of the closing argument. They say, why didn't he say? Because he did it. Do the jurors need a confession? In light of what they have? Well, and that's not the standard. I realize that. Well, sure, and that's what I'm saying. They don't need it. The question is, if you're sitting there and you hear... And I say that, I mean, did that influence them terribly? Did they need a confession in light of what the words show? Well, and that's why I'm pushing back a little bit. You're using the word need. Your Honor's using the word need. Need is not what we're looking at. The question is, did it affect them? And so if you're sitting there and you hear, yeah, you hear this damaging testimony. He's found in the car six hours later and he's a serial car thief. Oh, boy, what should I... Well, I've had two officers tell me that in their experience, people will tell them. And not only that, they investigated his quote alibi and found that it was false. They couldn't find a record of a phone call to the grandmother. They couldn't find this mysterious evidence that the DPD had. You know, it's all garbage. All of these things together, absolutely, I mean, when I read this, that would push somebody over the edge. And quite frankly, it doesn't even have to push them over the edge. It just has to have an effect. All of a sudden, everything that you see, all these explanations... Has to be more than a reasonable probability, too. You agree with that? What has to be more than a reasonable probability? There must be more than a reasonable possibility that the error was harmful. That's Davis v. Ayala. Agree with that? I'll go with that. Honestly, I don't know the case. But I'm okay with that. And I think that, you know, when we're all doing appeals, we're always looking at where we give the benefit of the doubt to the fact finder. We give the benefit of the doubt to the fact finder. And so, when you're on the ground, when you read this, what did the prosecution really think about its case? It thought it needed this statement. And it used it to the hilt. It used it as much as it could to put the icing on the cake, as was in the briefing. And so, yeah. I mean, I think it... I got it. You strongly think that this was a Doyle violation, right? Yeah, I do. I mean, Anderson talks about what's prohibited is trying to draw meaning from silence. And it sounds like the prosecutor certainly tried to draw meaning from silence. Well, and not only that, I mean, I pointed this out in my briefs. Not only that, but the trial court exacerbated the problem with its instruction and said, hey, don't worry about the fact that it didn't testify. But all these statements that are being let in, you can get all the adverse inferences from that that you want. Go for it. That was flat wrong. That was wrong. I mean, it's all wrong. Which gets to the issue at the end with the... I mean, I don't think it's a big deal. If we're trying to figure out if the September 8th statement is injurious, the jury instructions have to be considered. The jury is following the jury instructions. Yeah. They can consider his silence in custody. Right. And they do. You know, the jury, just laymen, make inferences all the time. And they make inferences, one, about propensity.  he's likely to do it again. And therefore, a criminal is probably guilty because he's a criminal. Well, that's an impermissive inference. And 403... not 403, 404 prohibits that. And then the other inference a jury naturally makes is that people would talk, that they wouldn't be silent. That when asked if they committed a crime, they would talk. Well, both these impermissible inferences are at play here. And... Yeah. And, you know, so whether that's a temporary statement affects the verdict with these inferences going on, it's... it's tough. Well, and... as to the instructions, yes, they follow their instructions. And yes, they were instructed, make this adverse inference if you like. And in addition, you know, again, this was pointed out, the state initially said, well, this is all just argument of counsel. But it... it's not just the instructions, there was evidence, extensive evidence from the officers about this. So it's both an instruction issue about what sort of inferences you can make. Then playing on these impermissible inferences, I mean, really playing it to the hilt. Yes. Knowing that that's what juries naturally would do. Yes. That's what we try to keep them from doing. Right. And the... as to why defense counsel didn't object, it makes no sense. I mean, I'm not going to say much more about that. It is... it was... it's... What about opposing counsel's theory that he wanted them to know that he was in Sterling Heights at 7-Eleven? And didn't want to get him on the stand. I wouldn't... I would not... I would... I understand not putting Mr. Hendricks on the stand. But letting in this statement about the DPD having video evidence. They know. They know. All that does is make him look totally nuts. And then the... then the detective goes through and says, oh yeah, I looked at that and it's not true and I looked at this and it's not true and I looked at this other... and he goes, how does that help? That doesn't help anybody. No... I mean, I... I'm sorry? Arguably, they think there's a little bit of reasonable doubt added. That's a theory. It's a terrible theory. It's... You might not have done it. I mean, we've... I don't know any reasonable defense attorney who, faced with this statement, would say, yeah, that's a good idea. Obviously, it's a very common strategy to not put the defendant on the stand. But to have put into the record statements that... I disagree, Your Honor, with that theory. Anything else, Your Honors? Okay, thank you. All right, a few items. The prosecutor's view of the evidence and how important it is is not, I don't think, can be part of the consideration. The prosecutor always uses all the evidence that they have that they think, rightly or wrongly, is properly admissible and that they can use. I can't stand up here and say, well... I mean, I did, but only as sort of a counterpoint. The defense counsel said this wasn't that important. The defense counsel said, the police officers can lie, they can manipulate, you don't need to look at what he said on September 8th and so on. And therefore, this court needs to decide that this had no influence on the jury. That's not the standard. It's not what the prosecutor told the jury how important the evidence was. It's not how defense counsel told the jury how important the evidence was. It's how this court actually believes how important the evidence was to the jury. So I don't think that the prosecutor's sort of casting of it can be determinative. And also, I think this court should look at the closing argument and how the prosecutor... that the argument wasn't evidence. The arguments are not evidence. Right, exactly. Both advocates get to ask the jury how to consider the evidence, but they're only arguments. The jury has to actually consider the evidence. And the prosecutor also heavily used the September 6th statements against him. And... The prosecutor said the September 8th statements were more important than the September 6th statements. That's correct, yes. That's what the prosecutor said. But, is that true? That's what this court... This court does not defer... This court doesn't defer in any sense to that statement. I mean, the prosecutor... We have to weigh what influence we think all of this had on the jury. Actually had on the jury, not what the prosecutor thought. I mean, if this court wants to start deferring to the prosecutors on things, I mean, we might get some really good opinions out of that, but I don't think that's the correct standard. And I don't think that's correct here. Is the Brecht standard if one juror would have found reasonable doubt, then it has a substantial injurious effect on the verdict? How is that defined? Well, if you say would have found reasonable doubt, as in it is certain that one juror would have, I mean, that would have changed the outcome. But it is more... That's all we have to determine, that this would have affected one of the jurors? Well, if you can say it would have affected one juror... Or likely? Or... What... It's... I mean... Right. These standards are always hard to determine. If you're in grave doubt as to whether... This is kind of ill-defined, isn't it, the Brecht standard? I mean... I think so. I think it is... I mean, grave doubt, if this court is in grave doubt, as to whether it had a substantial... Kind of like our gut feeling or something. I think there's some sort of a passage or an opinion that if... we have serious doubts ourselves... Right. Or we're left with a firm and definite conviction that there's been... That it casts doubt on the reliability of the verdict. It is not... It is a difficult standard to define. And our argument is basically... We know that it has to be more than a reasonable possibility, as Judge Cook said. We know that it has to be more than a small influence. And Brecht says that. And so that's the core of our argument is that the jury already knew... The jury already had the September 6th statements and the prosecutor had extensively argued that that constituted... He had the chance to say where he was. He lied instead. And if the jury... I mean... We heard about the fingerprints. We already talked about the identification. If a juror had harbored reasonable doubt based on those things, the September 8th statements wouldn't have made a difference. They would have said, I don't care what he said on September 8th when he heard all this stuff. We know that the victim identified somebody else, right? So that September 8th statement isn't going to make a difference. The fingerprints. If a juror had said, well, what about this third set of fingerprints? How about the whole cumulative thing? I mean, you're saying, okay, the fingerprints itself is not enough. The kind of ambiguous description of the perpetrator is not enough. This and that. But if you put them all together and then the fact that his silence is deafening, by his silence, he's saying, I did it. Because if you didn't do it, you tell us why. I mean, if we look at the cumulative effect of all this stuff, I mean, can we really say the September 8th statement didn't have a substantial and injurious effect? Yes, because that last statement you said, by his silence, he's saying he did it. That's what the prosecutor said. Yeah, but the prosecutor could have said that with respect to the September 6th statements. If the September 8th statements had been excluded, the prosecutor could have said, I mean, a lot of the... But he didn't, though. No, he didn't. He emphasized the September 8th statement, which was all erroneous, all inadmissible. Right. But I think we need to look at what would have happened if the September... I mean, if we're looking at the difference the September 8th statements made, we need to look at what would have happened if the September 8th statements hadn't been there. Maybe, is the easiest thing to do is send it back, have a new trial, and find out? No, the easiest thing to do is to affirm that we already had a trial. Our point of view is we already had a fair trial. So, I mean, as far as easy, the easiest thing to do is reverse. That's the question. That is the question. Absolutely. Our argument is that it is. You know, my worthy opponent disagrees. And I hope you agree with me. I hope that you agree that he got a fair trial, that the jury was not... He certainly didn't get a fair trial. Well, he didn't get an error-free trial. But the question is, the question is what effect the error had. And we agree that to the extent that the trial was tainted by error, we've said so. I'm not backtracking that. Okay. Thank you, Your Honor. Thank you, Your Honor. You're welcome. All right. Interesting case. Thank you both for your arguments. And the court, as you've heard, will consider your case carefully and issue an opinion in due course. And we'll be ready for the next case.